No. 99-056

IN THE SUPREME COURT OF THE STATE OF MONTANA

2000 MT 78

299 Mont. 142

998 P. 2d 531

WADE and CAROL MASON, husband and wife;

NEAL F. and JULIANE S. KETCHER, husband

and wife; K.R. and DONNA J. GOBLE, husband

and wife; ELIZABETH A. McGREGOR and

DAVID A. CEROTZKE; DENNIS H. McDOWELL

and JODEE McDOWELL, husband and wife;

DAVID W. KELLOGG, Trustee of the David W.

Kellogg Revocable Living Trust, UAD; HOLLISTER

A. LARSON, individually and as the personal

representative of THE ESTATE OF JEAN

ELIZABETH LARSON; JACOB L. KUYKENDALL,

JR., and SUSAN M. KUYKENDALL, husband

and wife,

Plaintiffs/Counter-Defendants/Respondents,

v.

GREG GARRISON,

Defendant/Counter-Claimant/Appellant.

_____

APPEAL FROM: District Court of the Eleventh Judicial District,

In and for the County of Flathead,

The Honorable Katherine R. Curtis, Judge presiding.

COUNSEL OF RECORD:

**For Appellant:**

John R. Gordon, Reep, Spoon & Gordon, Missoula, Montana

**For Respondent:**

Gary R. Christiansen, Warden, Christiansen, Johnson & Berg, Kalispell, Montana

_____

Submitted on Briefs: August 5, 1999

Decided: March 23, 2000

Filed:

_____

Clerk

Justice William E. Hunt, Sr. delivered the Opinion of the Court.

¶1.Greg Garrison (Garrison) appeals from the Findings of Fact, Conclusions of Law, and Judgment of the Eleventh Judicial District Court, Flathead County, concerning the scope of an easement across Garrison's lakefront lot for the benefit of specified lot owners in the Crag Moor Subdivision along Flathead Lake. We affirm in part and reverse in part.

¶2.We consider four issues, restated as follows:

¶(1) Did the District Court err by expanding the scope of the easement beyond the express terms of the grant?

¶(2) Did the District Court err in awarding the Lot Owners the right to repair or rebuild a dock on Lot 4?

¶(3) Did the District Court err in determining that the Lot Owners have a right to use the south access road across Lot 5?

¶(4) Did the District Court err in ordering Garrison to remove his fences and gardens and to restrain his dogs from interfering with the use of the easement?

Factual and Procedural Background

¶3.Crag Moor is a platted subdivision located on Hughes Bay along the west shore of Flathead Lake at the very south end of Flathead County, Montana. Most of the subdivision was purchased around 1960 by a partnership, Crag Moor Investments, which included Plaintiff Hollister A. Larson (Larson). The portion of Crag Moor purchased by the partnership consisted of some nineteen to twenty lots containing about 2,000 feet of lakeshore. The lots purchased by the partnership had never sold because much of the lakeshore was so steep that the lake was practically inaccessible from many of the lots. The partnership felt that if access to Flathead Lake were provided over Lots 3 and 4 for the benefit of Lots 5 through 19, then the lots would be marketable. Thus, beginning in 1969, an easement was included in each of the deeds for Lots 5 through 19 of Block 1 of the Crag Moor Subdivision. At the time of trial, each of the Plaintiffs-Respondents (the Lot Owners) owned one or more of the lots benefiting from the easement.

¶4.Prior to including the easement in the respective deeds, the partnership leveled a portion of Lot 4 between a rocky bluff and the lakeshore, widened existing roads so that boats could be trailered to the lake and launched, created a parking area for vehicles, and

constructed a dock and swim deck for recreational purposes. The roadways that were improved by the partnership consisted of both a "north access" road, which has been primarily used by the Lot Owners when coming from Kalispell to the easement area, and a "south access" road that has been primarily utilized by the Lot Owners when traveling from their lots to the lakeshore.

¶5.The easement in the deeds to Lots 5 through 19 of Crag Moor provides as follows:

TOGETHER WITH a perpetual easement over and across the existing roadways on Lots 3 and 4 of Block 1 of said Crag Moor (excepting private driveways) for ingress and egress to and from Flathead Lake and the perpetual right and easement to use the existing dock, parking lot, swimming areas and swimming deck thereon, which easement is not exclusive but must be exercised with respect to the rights of other persons lawfully using said lands and facilities.

¶6.The "Lots 3 and 4 of Block 1" referred to in the easement were eventually re-surveyed and the subdivision plat was amended (Amended Lots 3 and 4). When Amended Lot 4 was sold to Garrison's predecessor in interest, the legal description specifically made the conveyance "subject to" the terms of the easement. In 1992, Garrison purchased Amended Lot 4 and a portion of Lot 2 of Block 1 of Crag Moor with actual knowledge that Amended Lot 4 was subject to the easement. Garrison also owns Lots 5 through 9 of Block 1 of Crag Moor, which benefit from the easement.

¶7.Amended Lot 3 is presently owned by Arlen D. Steiner (Steiner), who is not a party to this action. Part of the easement is located on Amended Lot 3. The "swimming deck" described in the easement was located in the water adjacent to Amended Lot 3 but, in 1979, was destroyed by the owner of the Lot at that time. In 1988, a boat dock was erected on Amended Lot 3 in much the same location as the old swimming deck by Steiner's predecessor in interest. The "dock" referenced in the easement existed in the water adjacent to Amended Lot 4 until 1985, when it was severely damaged by a storm. Sometime after the storm, the then-owner of Amended Lot 4 bulldozed the remains of the dock and torched them. That dock was never replaced but its "footprint" remains visible in the water today.

¶ 8.In 1990, moreover, Garrison's predecessor in interest constructed a new dock on Amended Lot 4 in somewhat the same location as the previous boat dock that had been destroyed. Garrison's predecessor in interest also constructed a large pole gate at his

driveway entrance, and the poles were located in the middle of the south access road. Although the poles have remained in that location since erected, the Lot Owners have routinely passed around the poles in continuing to use the south access road to reach the lakefront.

¶9. When the easement was created, the lakeshore area on Amended Lot 4 was pebbles or gravel. A boat launch was never constructed by the partnership on Amended Lot 4. However, the sloping, pebbly shoreline enabled the Lot Owners to put in small boats and take them out in the easement area. In the "parking lot" described in the easement there was at one time a picnic table which had been placed there by the partnership. Over the years, the parking area was used for parking and turning vehicles around, as well as for picnics, camping, and other lake-related recreational purposes by the Lot Owners.

¶10. In 1995, Garrison constructed two raised gardens in the parking area because, according to him, it is the area of his property that receives the most sunshine. Garrison has also placed fences across the north and south roadways used by the Lot Owners, as well as a fence that runs along the shoreline and encloses much of the parking area. Additionally, Garrison has allowed his six German Shepherd dogs to run loose in the easement area, and their aggressive behavior has prevented some of the Lot Owners from peaceably accessing the lakeshore.

¶11. The District Court found that the easement was created to provide the Lot Owners with an area to access Flathead Lake for swimming, boating, and other lake-related recreational activities. The court further found that Garrison's gardens, fences, and dogs unreasonably obstructed and interfered with the Lot Owners' use of the easement, and that there were alternative means of fencing Garrison's property and dogs that would neither interfere with the easement area nor deny Garrison reasonable use of his property. Thus, the District Court ordered Garrison to remove his gardens and fences from the easement area, and to restrain his dogs from interfering with the Lot Owners' use of the easement.

## Standard of Review

¶12. We review a district court's findings of fact to determine whether they are clearly erroneous, giving due regard to the opportunity of the court to judge the credibility of the witnesses. Public Lands Access Ass'n, Inc. v. Boone & Crocket Club Found., Inc. (1993), 259 Mont. 279, 283, 856 P.2d 525, 527 (quoting Rule 52(a), M.R.Civ.P.). A finding of fact is clearly erroneous if it is not supported by substantial evidence, if the court has

misapprehended the effect of the evidence, or if a clear and definite mistake has been made. Garrison v. Averill (1997), 282 Mont. 508, 516, 938 P.2d 702, 707 (citing Schaal v. Flathead Valley Community College (1995), 272 Mont. 443, 446-47, 901 P.2d 541, 543); see also Interstate Production Credit Ass'n v. DeSaye (1991), 250 Mont. 320, 323, 820 P.2d 1285, 1287. We review a trial court's conclusions of law to determine whether they are correct. See Steer, Inc. v. Department of Revenue (1990), 245 Mont. 470, 474-75, 803 P.2d 601, 603. Discussion

¶13.(1) Did the District Court err by expanding the scope of the easement beyond the express terms of the grant?

¶14.The District Court found that the "easement as originally written and created . . . does not necessarily restrict the uses to which the areas may be put, except to the extent that the uses must be reasonably necessary and convenient for the purposes for which the easement was created." The court thus concluded that the Lot Owners have a "perpetual easement over the servient tenement owned by Garrison for all uses reasonably necessary, convenient and incident to enjoyment and use of the easement in accordance with the purpose for which it was created."

¶15.Section 70-17-106, MCA, which governs how a servitude is to be construed, provides that "[t]he extent of a servitude is determined by the terms of the grant . . . by which it was acquired." Section 70-17-106, MCA. Garrison asserts that the District Court erred as a matter of law in failing to recognize that the servitude in question here is a specific, granted easement under the statute and, therefore, that the Lot Owners' rights are strictly limited to the uses specified in the easement. In response to Garrison's contention that the District Court inappropriately expanded the scope of the easement beyond those uses specified in the granting instrument, the Lot Owners argue that the court properly received evidence of historic use in defining the scope of the easement because the granting language is general in nature and does not restrict the uses to which the easement may be put. We agree.

¶16.The clear purpose of the easement, viewed as a whole, was to provide the Lot Owners with a means of accessing and enjoying Flathead Lake. However, as Garrison recognizes, there are really two separate but related easements created by the Lot Owners' deeds: (1) a perpetual easement of access across "existing roadways on Lots 3 and 4 of Block 1" of Crag Moor for the purpose of "ingress and egress to and from Flathead Lake"; and (2) a perpetual easement to use "the existing dock, parking lot, swimming areas and swimming

deck" while accessing the lakefront. Although Garrison is correct in pointing out that the second easement refers to "specific identifiable improvements" which the Lot Owners have a permanent easement to use, he is incorrect in deducing, from that premise, that the plain language of the easement therefore prohibits the Lot Owners from any other uses of the lakeshore area such as launching small boats, picnicking, and socializing.

¶17. Where an easement is specific in nature, the breadth and scope of the easement are strictly determined by the actual terms of the grant. See Bridger v. Lake (1995), 271 Mont. 186, 191, 896 P.2d 406, 408 (citing § 70-17-106, MCA; Titeca v. State of Montana (1981), 194 Mont. 209, 214, 634 P.2d 1156, 1159). In other words, if the grant "'is specific in its terms, it is decisive of the limits of the easement.'" Titeca, 194 Mont. at 214, 634 P.2d at 1159 (quoting 25 Am. Jur. 2d Easements and Licenses § 73, at 479).

¶18. In contrast, where, as here, the granting language is not specific in nature, courts must look beyond the plain language of the grant in defining the scope and breadth of the servitude:

"If the easement is not specifically defined, it need only be such as is reasonably necessary and convenient for the purpose for which it was created. It is sometimes held . . . where the grant or reservation of an easement is general in its terms, that an exercise of the right, with the acquiescence and consent of both parties, in a particular course or manner, fixes the right and limits it to that particular course or manner."

Strahan v. Bush (1989), 237 Mont. 265, 268, 773 P.2d 718, 720 (quoting 25 Am. Jur. 2d Easements and Licenses § 73, at 479). Under such circumstances, the question of what may be considered reasonably necessary and convenient in light of the easement's intended purpose is determined with a view to the situation of the property and the surrounding circumstances. Strahan, 237 Mont. at 268, 773 P.2d at 720.

¶19. The second easement, while referring to particular structures (the "dock" and "swimming deck") which the Lot Owners are entitled to use, does not expressly enumerate or otherwise restrict the uses to which those facilities may be put. Nor does it restrict the uses to which the easement area itself may be put. As the District Court found, the partnership developed a portion of Amended Lot 4 between a rock bluff and the lakeshore with the intent that Lots 5 through 19 could utilize this area to access and enjoy Flathead Lake. Indeed, it must necessarily be implied from the reference to said facilities as well as the "parking lot" and "swimming areas" that the Lot Owners possess a right to use not

only the specified facilities, but also the <u>waterfront lands</u> lying within the general area of those facilities for lake-related purposes.

¶20.Thus, with respect to the second easement, Garrison is incorrect in arguing that the granting language is so specific in nature that it was inappropriate for the District Court to receive extrinsic evidence of historical use in defining what uses of the easement are reasonable. We hold that the District Court correctly determined that the second easement is general in nature, and that the extent of the Lot Owners' rights thereunder are, therefore, defined by historic use as acquiesced and consented to by the holders of the dominant and servient tenements.

¶21.Evidence was presented showing that, over the years since the creation of the easement, the Lot Owners had to varying extents utilized the lakeshore area of Amended Lot 4 for swimming, picnicking, launching small boats, building campfires, temporarily parking their vehicles, and generally engaging in social and recreational activities associated with the lake. As the Lot Owners indicate, these historical uses of the easement were not only acquiesced or consented to by the preceding owners of Amended Lot 4, but were actively facilitated by the actions of the partnership in improving the existing roadways, leveling the parking and turn-around area, constructing a swimming deck and dock, and installing a picnic table.

¶22.In light of the evidence of historical use, including the testimony of Larson that the partnership intended the easement to provide a lake access area for Lots 5 through 19 of Crag Moor, we reject Garrison's contention that the District Court has increased the burden on the servient tenement beyond that contemplated at the time of the easement's creation. It is well settled that no use may be made of an easement " 'different from that established at the time of its creation, so as to burden the servient estate to a greater extent than was contemplated at the time of the grant.' " Sampson v. Grooms (1988), 230 Mont. 190, 195, 748 P.2d 960, 963 (quoting <u>Titeca</u>, 194 Mont. at 214, 634 P.2d at 1139). Here, the evidence shows that the District Court did not expand the scope of the easement beyond those uses contemplated by the partnership at the time of the grant and historically enjoyed by the Lot Owners since that time.

¶23.We hold that the District Court's factual findings as to historic use are supported by substantial credible evidence and are not clearly erroneous. The Lot Owners have a right in common, as the District Court correctly found and concluded, to use the waterfront lands and facilities lying between the rock bluff and the lakeshore on Amended Lot 4 to

launch and dock small boats, swim, have picnics and build campfires, park their vehicles while using the easement, "and generally engage in social and recreational activities necessarily incident to the enjoyment of the lake access granted in the easement."

¶24.(2) Did the District Court err in awarding the Lot Owners the right to repair or rebuild a dock on Amended Lot 4?

¶25.The District Court also found and concluded that the Lot Owners possess a right to "erect and maintain a boat dock similar in nature to the dock previously located on the easement area, subject to the acquisition of all necessary permits from the governing agencies." As previously mentioned, the "dock" referred to in the easement was originally located in the water adjacent to Amended Lot 4. That dock was seriously damaged in a 1985 storm and subsequently destroyed by a previous owner of Amended Lot 4. The "footprint" of the original dock, however, is still visible in the water.

¶26.Garrison claims, alternatively, that the District Court erred (1) in holding that the easement was not extinguished by the destruction of the original dock pursuant to § 70-17-111(2), MCA, and (2) in holding that the dock easement was not extinguished by prescription pursuant to § 70-17-111(3), MCA. Section 70-17-111, MCA, provides in pertinent part that:

**How servitude extinguished.** A servitude is extinguished:

. . . .

(2) by the destruction of the servient tenement;

(3) by the performance of any act upon either tenement by the owner of the servitude or with his [or her] assent which is incompatible with its nature or exercise . . . .

Section 70-17-111, MCA. We address each of Garrison's contentions in turn.

¶27.Regarding Garrison's first claim of extinguishment pursuant to § 70-17-111(2), MCA, the Lot Owners take the position that since the easement clearly states that they have a "perpetual right and easement to use the existing dock," they therefore have a right to repair or replace the original dock as a necessary incident of the easement which they purchased along with their lots. They rely on § 70-1-320, MCA, which provides that "[a] perpetual interest has a duration equal to that of the property." Section 70-1-320, MCA.

Garrison counters by claiming that the boat dock is "the property" in which the Lot Owners have a perpetual interest and that, by virtue of statute, that interest was terminated upon the destruction of the dock. According to Garrison, under § 70-17-111(2), MCA, the Lot Owners' easement in the dock was extinguished when the 1985 storm destroyed the dock.

¶28.Because there are no Montana cases directly on point interpreting § 70-17-111(2), MCA, Garrison relies primarily on the California Supreme Court case of Rothschild v. Wolf (Cal. 1942), 123 P.2d 483, which interpreted the identically worded provision of § 811 of the California Civil Code. Rothschild involved a granted easement to use a stairway in an adjoining building "'so long as the lot on which said stairway is now built, is occupied by the building now on said lot of which said stairway forms a part.'" Rothschild, 123 P.2d at 484. In construing the "stairway easement," the California Supreme Court noted the general rule that "a grant of the right to use a hall or stairway of a building gives no interest in the soil which will survive the destruction of the building." Rothschild, 123 P.2d at 485. This rule may be applicable even where, as here, the granting language provides that the easement shall be "perpetual" or "forever" in duration. See, e. g., Muzio v. Erickson (Cal. Ct. App. 1919), 182 P. 974, 976; Cohen v. Adolph Kutner Co. (Cal. 1918), 171 P. 424, 425-26.

¶29.Garrison urges this Court to apply the foregoing rule and hold that the second easement at issue here granted only a right to use the dock and, therefore, that the destruction of the dock signaled the termination of the easement. However, the Rothschild court also put forth the following passage which we find dispositive of this issue:

An easement, in the true sense of the word, is an interest in real estate, and survives the destruction of a part of the servient tenement when there is anything remaining upon which the easement may operate. But a right in the nature of "an easement in a building," as it is sometimes called, is extinguished by the destruction of the building, or the part thereof upon which the easement is imposed, so that there is nothing upon which it can operate.

Rothschild, 123 P.2d at 485; accord Muzio, 182 P. at 975; Cohen, 171 P. at 425.

¶30.As noted under the first issue on appeal, the second easement grants the Lot Owners more than just the right to use certain specified structures (the "dock" and "swimming deck"); it also necessarily grants to the Lot Owners, by reference to the "parking lot" and

"swimming areas," a right to use the shoreline area of Amended Lot 4 for lake-related purposes. The rule pertaining to stairway or building easements is inapplicable here because we determine that the "dock" itself as referenced in the second easement does not constitute the servient tenement. Leading commentators have, for example, noted that:

A building, instead of land, may serve as the servient or the dominant estate for an easement. In such a case, destruction of the building generally extinguishes the easement.

It is important to note that this principle applies only when the destroyed building was actually the servient or dominant estate. If, as is typically the case, the destroyed building merely was located on land burdened or benefited by an easement, the servitude is not extinguished. [Emphasis added.]

Jon W. Bruce & James W. Ely, Jr., The Law of Easements and Licenses in Land § 10.03 [3], at 10-17 (rev. ed. 1995) (footnotes omitted).

¶31. Therefore, where an easement in an artificial structure (e.g., the "dock") is coupled with an interest in land, the easement is not extinguished by the destruction of the structure or the part of it upon which the easement operates. See 25 Am. Jur. 2d Easements and Licenses § 120, at 691 (1996). Here, the Lot Owners' rights under the easement to use the "dock" and "swimming deck" are coupled with an interest in land: the right to use the shoreline area of Amended Lot 4 lying between a rocky bluff and the water. In other words, the second easement is more properly characterized as burdening the shoreline area of Amended Lot 4, with the specific rights to use the "dock" and "swimming deck" as express incidents of the right to utilize that general area for lake-related purposes. Viewed in this manner, the easement itself cannot be said to have been extinguished when the dock was destroyed.

¶32. Even assuming, *arguendo*, that the Lot Owners possessed only an interest in the dock itself, that easement would not be extinguished here because, as the Lot Owners indicate, the "footprint" of the original dock is still extant. The foundation of the original dock was created by drilling holes in the rock of the lake bed, in which steel supports were inserted. These foundational supports are still visible in the water today and, therefore, there remains something upon which the original easement in the dock itself may operate. Rothschild, 123 P.2d at 485.

¶33. In the alternative, we agree with the District Court's reasoning "that damage to and

destruction of the servient tenement, i.e., the boat dock, caused by an owner of the servient tenement does not terminate or extinguish an easement." <u>See</u> 25 Am. Jur. 2d <u>Easements and Licenses</u> § 120, at 691 (1996). The Lot Owners point out that the dock, though badly damaged by the 1985 storm, was in fact destroyed when a preceding owner of Amended Lot 4 bulldozed and torched the dock's remains following the storm. Although there appears to be a split of authority on the subject, we note that the <u>Rothschild</u> decision upon which Garrison relies held that the destruction rule pertaining to stairway or building easements applies only when the artificial structure serving as the servient tenement is destroyed without the fault of its owner. <u>See</u> <u>Rothschild</u>, 123 P.2d at 486 (holding that the owner of the servient tenement "may not destroy the easement . . . [and] the easement shall continue until the building . . . is destroyed or the easement becomes inoperative without the fault of the [owner of the servient tenement]"). We hold that the District Court correctly denied Garrison's claim of extinguishment premised upon § 70-7-111(2), MCA.

¶34.Regarding Garrison's second claim of extinguishment by prescription under § 70-7-111(3), MCA, we likewise affirm the District Court. In the absence of clearly adverse use, it is elementary that mere non-use of a permanent, express easement will not lead to extinguishment by prescription. <u>See</u> Halverson v. Turner (1994), 268 Mont. 168, 175, 885 P.2d 1285, 1290. Nevertheless, Garrison points out that none of the Lot Owners ever objected to the destruction of the dock by the preceding owner of Amended Lot 4; he argues that this constitutes "assent" to extinguishment of the easement in the dock. <u>See</u> § 70-7-111(3), MCA. Further, Garrison contends that since the destruction of the dock by the preceding owner of Amended Lot 4 was hostile to the Lot Owners' exercise of their rights in the dock and continued for more than five years, the easement in the dock was therefore terminated by prescription.

¶35.However, we agree with the Lot Owners that the record does not support Garrison's contention. There was no specific evidence presented as to when the preceding owner of Amended Lot 4 destroyed the original dock, however, that action clearly occurred sometime after the 1985 storm. And, as the Lot Owners point out, Amended Lot 4 was sold to Garrison's predecessor in interest on July 7, 1989. The deed specifically included the easement in question and the sale was made "subject to" the easement. Moreover, in 1990, Garrison's predecessor in interest testified through his attorney at a hearing on an application for a permit to construct a dock that he would "welcome" the Lot Owners' "use" of the new dock and existing swimming areas on Amended Lot 4, and would support the Lot Owners if they chose to attempt to procure a permit to rebuild the original dock provided for in the easement. Clearly, these facts do not show adverse, hostile

file:///C|/Documents%20and%20Settings/cu1046/Desktop/opinions/99-056%20Opinion.htm

actions for the requisite five-year period. Based on the record, we hold that the District Court correctly denied Garrison's claim of extinguishment by prescription pursuant to § 70-7-111(3), MCA.

¶36. The Lot Owners possess a "permanent" easement to use the "existing dock," which must be read as implying that they have a right to construct and maintain a new dock in the same location as the original dock as a necessary incident of their perpetual right of lake access. Furthermore, the District Court found that the dock constructed by Garrison's predecessor in interest on Amended Lot 4, though not intended to "replace" the dock referenced in the easement, lies in roughly the same location as the original dock that had been destroyed. Therefore, we affirm the District Court's resolution of this matter: the Lot Owners have a right to apply for a permit to build a new dock in the location of the original dock on Amended Lot 4; and if they are unsuccessful because Garrison refuses to assent to such a permit, then they have a right to use the dock constructed by Garrison's predecessor in interest.

¶37. (3) Did the District Court err in determining that the Lot Owners have a right to use the south access road across Lot 5?

¶38. The District Court held that the Lot Owners have a perpetual easement "[t]o use the existing roadways as shown on Plaintiffs' Exhibit 17 and Defendant's Exhibit V1 for the purposes of walking and/or driving to the lakeshore contained within the boundaries of Amended Lot 4." In so holding, the court granted the Lot Owners the right to use the "south access" road. Garrison contends that the District Court erred in finding and concluding that the Lot Owners possess a right pursuant to the easement to use the south access road because it crosses Lot 5 and, therefore, contravenes the express terms of the grant. We agree.

¶39. As mentioned under the first issue on appeal, there are really two related easements created by the Lot Owners' deeds. Here, we are referring to the first "perpetual easement" of access "over and across the existing roadways on Lots 3 and 4 of Block 1 of said Crag Moor (excepting private driveways) for ingress and egress to and from Flathead Lake." In contrast to our conclusion with regards to the second easement to use the lakeshore lands and facilities on Amended Lot 4, we conclude that the first easement of access is sufficiently specific in nature that the terms of the grant are decisive of the limits of the servitude. Titeca, 194 Mont. at 214, 634 P.2d at 1159.

file:///C|/Documents%20and%20Settings/cu1046/Desktop/opinions/99-056%20Opinion.htm (13 of 16)4/5/2007 1:59:53 PM

¶40.The first easement grants the Lot Owners a permanent right to use existing roadways "<u>on Lots 3 and 4</u>" of Block 1 of Crag Moor. The exhibits which the District Court relied upon reveal that the "south access" road that has long been utilized by the Lot Owners forks from the "north access" road on Amended Lot 4 and then crosses the northwest corner of Lot 5 to meet the county road. Larson, the only living member of the partnership that created the easement, testified at trial regarding the Lot Owners' use of the south access road:

Q: So you were using part of lot 5?

A: Yes.

Q: And where did you get the right to use lot 5? Is it granted in your easement?

A: Yes.

Q: And would you please show me, sir, where . . . it grants you the right to go across lot 5.

A: It says "the existing roadways."

Q: "On lots 3 and 4"; isn't that what it says?

A: Yeah. . . . At that time we straightened out the road with my bulldozer, we didn't realize that was lot 5.

Q: So . . . that description of the easement doesn't contain any right to go across lot 5; isn't that right?

A: Right.

¶41.Regardless of the intent of the partnership in improving the south access road or the evidence of historical use of that road by the Lot Owners, the District Court's holding is contrary to the express terms of the grant. The evidence shows that the south access road runs across the corner of Lot 5. The Lot Owners do not claim a right to use that road by prescription. We hold that the District Court erred in concluding that the easement grants the Lot Owners a right to utilize the "south access" road across Lot 5 to reach the lakeshore easement area.

¶42.(4) Did the District Court err in ordering Garrison to remove his fences and gardens and to restrain his dogs from interfering with the use of the easement?

¶43.The general rule is that the owner of the servient tenement may make use of the land in any lawful manner that he or she chooses, provided that such use is not inconsistent with and does not interfere with the use and right reserved to the dominant tenement or estate. See Gabriel v. Wood (1993), 261 Mont. 170, 176, 862 P.2d 42, 45-46. Garrison asserts that the District Court improperly ordered him to remove his fences and gardens and to restrain his dogs because those uses of his property did not interfere with any right of use granted to the Lot Owners by the easement. We disagree.

¶44.The record suggests that Garrison embarked on a vexatious course of conduct apparently intended to interfere with the Lot Owners' use of the easement and, thereby, to bring the scope of the easement into dispute. With this decision, the scope of the easement is settled: the Lot Owners have a right to travel across the "north access" road and use the shoreline lands and facilities of Amended Lot 4 between the rocky bluff and the water for lake-related purposes, including, *inter alia*, parking, boating, swimming, picnicking, and socializing.

¶45.Garrison is entitled, as the owner of the servient tenement, to make any reasonable use of his property which does not interfere with the Lot Owners' rights. In turn, the Lot Owners are entitled to utilize the easement area for its intended purposes, but not to the exclusion of Garrison since the easement states that is "not exclusive" in nature. While Garrison may not be excluded from reasonable use of his property by the Lot Owners, nor may he put his property to a use that materially interferes with the rights of the dominant estates. The record demonstrates that Garrison's fences, gardens, and dogs unreasonably interfered with the Lot Owners' use of the easement. Therefore, we hold that the District Court correctly ordered the relief that it did.

¶46.This case is remanded to the District Court for modification of the judgment. The Lot Owners shall be enjoined from utilizing the "south access" road across Lot 5 to reach Flathead Lake. In all other respects, the court's judgment is affirmed.

¶47.Affirmed in part, reversed in part and remanded.

/S/ WILLIAM E. HUNT, SR.

We Concur:

/S/ TERRY N. TRIEWEILER

/S/ JAMES C. NELSON

/S/ W. WILLIAM LEAPHART